Jan W. BECKOM, Gyla Beckom, Janelle Y. Beckom, Jamie Beckom and Jana Beckom, Appellants–Plaintiffs,

v.

David B. QUIGLEY, Appellee–Defendant.

No. 80A05–0407–CV–372.

Court of Appeals of Indiana.

March 24, 2005.

---

Ronald W. Frazier, Frazier & Associates, Indianapolis, IN, Frank Tolbert, Miller Tolbert Muehlhausen, Muehlhausen Groff & Damm, PC, Logansport, IN, Attorneys for Appellants.

David M. Haskett, Julia Blackwell Gelinas, Lucy R. Dollens, Locke Reynolds, LLP, Danford R. Due, Due Doyle Fanning & Metzger, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Plaintiffs, Jan W. Beckom, Gyla Beckom (Gyla), Janelle Y. Beckom, Jamie Beckom, and Jana Beckom (collectively, the Beckoms), appeal the trial court's grant of summary judgment in favor of Appellee–Defendant, David B. Quigley (Quigley).

We affirm.

### ISSUES

The Beckoms raise two issues on appeal, which we restate as follows:

(1) Whether the trial court erred in finding, as a matter of law, that attorney Quigley did not owe a duty to the Beckoms because they were unknown third-party beneficiaries under a will; and

(2) Whether the trial court erred in finding, as a matter of law, that Quigley did not fraudulently or tortiously interfere with the Beckoms' inheritance in order to reap a personal financial benefit.

## FACTS AND PROCEDURAL HISTORY

Gyla met Gene Sellers (Gene) in 1984. Over the years, Gene frequently visited the Beckoms' home and considered them to be his family. He purchased gifts for the family and took them on vacation, while the Beckoms often helped Gene on his farm, located in Tipton County, Indiana. Eventually, with financial assistance from Gene, the Beckoms moved closer to Gene's farm.

In 1990, at Gene's request, his attorney, Quigley, prepared a Last Will and Testament, which was executed on December 3, 1990. In his will, Gene left his entire estate to his father and, if his father predeceased him, to Taylor High School and Purdue University School of Agriculture in trust and in equal shares. Thereafter, in late 1999, Gene was diagnosed with cancer, and on August 28, 2001, Gene executed a Durable Power of Attorney naming Gyla and Quigley as his attorneys in fact and a Health Care Representative Designation appointing Gyla as his health care representative. On December 6, 2001, Quigley prepared and Gene executed a second Last Will and Testament, in which Gene left his entire residual estate to Taylor High School and Purdue University to provide scholarships for students. In this will, Quigley was named as co-executor and attorney for the estate.

From the beginning of his illness, Gyla would drive Gene to the hospital and doctor appointments. In early 2002, Gyla stopped looking for work in order to devote more time to Gene. On several occasions, Gene would assure Gyla that "she would be well taken care of," in consideration of all the help she was giving him. (Appellant's App. p. 199). Eventually, Gene moved in to the Beckoms' home due to the severity of his illness. In an attempt to accommodate Gene, the Beckoms changed the plumbing and installed shower furniture. On May 30, 2002, Gene underwent brain surgery to remove a cancerous tumor. Thereafter, Gene was released from the hospital and started rehabilitation. However, on August 12, 2002, Gene relapsed and was admitted to the hospital for pneumonia.

The next day, on August 13, 2002, Gyla left a message with Quigley's assistant informing him that Gene was back in the hospital with pneumonia, and that he wanted to speak with Quigley about inserting a provision in his will for a gentleman to have first option in purchasing Gene's farm. Upon returning Gyla's message, Quigley learned that the identity of the gentleman was Matt Cannon (Cannon). That same day, Quigley prepared a codicil for Gene's execution, granting Cannon the first right to purchase the farm. Quigley also arranged with Gyla to meet with Gene on August 20, 2002 at 10:00 a.m. at the hospital to review the codicil and confirm it reflected Gene's intent. However, Gene died early on August 20, 2002 prior to the meeting with Quigley.

On March 24, 2003, the Beckoms filed their Complaint, alleging that attorney Quigley was negligent in failing to ascertain that the Beckoms were the intended, sole beneficiaries of Gene's estate. On February 9, 2004, Quigley filed his Motion for Summary Judgment, brief in support thereof, and designation of evidence. On March 10, 2004, the Beckoms filed their Memorandum in Opposition and designation of evidence. Thereafter, on March 26, 2004, Quigley filed his Response and supplemental designation of evidence. On April 16, 2004, the trial court held a hearing on Quigley's Motion for Summary Judgment, and took the matter under advisement. Consequently, on June 16, 2004, the trial court entered its Order, granting Quigley's Motion for Summary Judgment.

The Beckoms now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

The Beckoms present two issues for our review. First, they argue that Quigley was negligent in his duty to the Beckoms, as third party beneficiaries, by failing to ensure that they received Gene's estate. Second, they claim that Quigley fraudulently rejected the Beckoms' beneficiary status in order to reap the financial benefits that would be awarded to him by the probate court in administering the Taylor High School and Purdue University trusts.

### I. Standard of Review

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Am. Family Mut. Ins. Co. v. Hall*, 764 N.E.2d 780, 783 (Ind.Ct.App. 2002), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *See Ayres v. Indian Heights Volunteer Fire Dep.'t, Inc.*, 493 N.E.2d 1229, 1234 (Ind.1986).

We bear in mind that negligence cannot be established by inferential speculation alone. *Colen v. Pride Vending Service*, 654 N.E.2d 1159, 1163 (Ind.Ct.App. 1995), *reh'g denied*. Testimony based on conjecture or speculation is insufficient to support a claim. *Id.* Qualitatively, evidence fails when it cannot reasonably be said that the intended inference may logically be drawn therefrom. *Id.* The failure of an inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture. *Id*

Although the question of whether a defendant has breached a duty is a question of fact for the jury, the existence of a duty is generally a question of law for the court to determine. *Geiersbach v. Frieje*, 807 N.E.2d 114, 122 (Ind.Ct.App.2004), *reh'g denied, trans. denied*. Here, the question before us is whether Quigley owed a duty to the Beckoms. This is a question of law, not a question of fact, and is therefore properly considered under a motion for summary judgment.

### II. Negligence

The Beckoms initially dispute the trial court's Order finding, as a matter of law, that attorney Quigley did not owe a duty to the Beckoms pursuant to a negligence claim because they were unknown third-party beneficiaries under a will. As their main argument, the Beckoms allege that there is sufficient evidence imputing that Quigley had actual knowledge of Gene's intent to leave his estate to the Beckoms.

The parties correctly acknowledge that to premise a recovery on a theory of negligence, the moving party needs to establish three elements: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the

plaintiff proximately caused by the breach. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991), *reh'g denied.*

### A. Duty

■ Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff, three factors must be balanced: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Id.* Thus, our analysis must examine each of these three factors in turn to determine if Quigley owed a duty to the Beckoms.

### 1. Relationship between Quigley and the Beckoms

■ The heart of the present case concerns attorney Quigley's actions, or absence thereof, in determining Gene's testamentary intent regarding the disposal of his estate. Thus, duty being the threshold requirement for a negligence claim, the Beckoms must first prove the existence of a relationship with Quigley. *See Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind.Ct.App. 1991), *reh'g denied.* This relationship need not be express; it may be implied from the conduct of the parties. *Id.*

However, unlike the Beckoms, in the context of a will, we find *Walker v. Lawson*, 526 N.E.2d 968 (Ind.1988) to be controlling. In *Walker*, our supreme court clearly held that the breach of an attorney in drafting a will for a client can become the basis for a claim by a known beneficiary who suffers injury as a consequence of that breach. *Id.* at 970; *see also Webb*, 575 N.E.2d at 996 (holding that a professional owes no duty to third persons unless the professional had actual knowledge that those persons would rely on his rendering of professional services); *Essex v. Ryan*, 446 N.E.2d 368, 374 (Ind.Ct.App.1983) (holding that a duty may be owed to a beneficiary of a consensual relationship, akin to that of a third-party beneficiary of a contract, where the professional has actual knowledge that the services being provided are, in part, for the benefit of such third persons). In *Walker*, attorney Lawson drafted a will for his client, making his client's children from her first marriage the sole beneficiaries of her estate, to the exclusion of her second childless spouse. *See Walker*, 526 N.E.2d at 968–69. The supreme court based its holding on the existence of evidence establishing the client's explicit purpose to meet with her attorney to deprive her spouse of any interest in her estate. *See id.* at 969. The court further noted that there was little doubt that attorney Lawson and the client discussed the omission of her spouse to the benefit of her children. *See id.* After the client's death, her spouse elected to take his statutory interest in the estate, resulting in a malpractice claim against the attorney by one of the children. *See id.* Since our supreme court determined the child to be a known beneficiary under the will, he could file a complaint sounding in negligence against Lawson. *See id.*

Based on our review of the designated evidence, we conclude that Quigley never knew that the Beckoms were intended beneficiaries under Gene's will. Unlike *Walker*, where the testator had clearly identified the beneficiaries and the omitted parties under the will to her attorney, here, Gene never informed Quigley that the Beckoms should be included as beneficiaries of his estate. Rather, the instant case is built upon the mere speculation that Gene wanted to change his will to the advantage of the Beckoms.

The Beckoms present us with an abundance of evidence indicating that Gene wanted to make changes to his will and

was attempting to get in contact with Quigley prior to his death. Based on conversations between the Beckoms and Gene around Gyla's kitchen table, the Beckoms believed this change involved Gyla inheriting Gene's farm because he wanted to take care of the family. However, the record is devoid of any evidence establishing that Quigley was informed of this intended change. As Gyla clearly admitted, she never told Quigley that Gene intended to leave the farm to her. Even though the Beckom family testified that on several occasions they dialed Quigley's office number on Gene's behalf, they added that they never talked to Quigley themselves, but always handed the phone to Gene and then left the room. They also stated they cannot confirm that Gene actually talked to Quigley during those calls.

Moreover, our conclusion today is further supported by the timeline of events in this case. After Gene was diagnosed with cancer in late 1999, Gyla helped Gene by driving him to the hospital and doctor appointments. As his illness progressed, Gyla increased her aid to the point where she ceased searching for new employment in order to take care of Gene. In exchange, Gene trusted Gyla by giving her a power of attorney and naming her his heath care representative in August of 2001. Nevertheless, when Gene executed his second will six months later, on December 6, 2001, he left his residual estate to Taylor High School and Purdue University without even including a provision for the Beckoms. After his surgery in May of 2002, Gene moved in with the Beckoms. The record discloses that sometime between July 28 and August 13, 2002, seven days prior to his death and eight months after the execution of his second will, Gene stopped by Quigley's office. Asked by Quigley if Gene wanted to speak to him, Gene responded negatively and stated that he just stopped by to say hello.

Even though the Beckoms allege that everybody in their community knew Gene wanted to take care of them, we refuse to equate general community knowledge to actual knowledge by Quigley without anymore more than mere speculation. *See Colen*, 654 N.E.2d at 1162.

■ The Beckoms, however, now try to circumvent *Walker's* actual knowledge of a third-party beneficiary element by claiming that a direct relationship between Quigley and the Beckoms was established because Quigley and Gyla held co-powers of attorney. Although we find the argument to be creative, we are not persuaded. Pursuant to Indiana Code section 30–5–5–15, an attorney in fact is authorized to do the following:

(1) Accept, receipt for, exercise, release, reject, renounce, assign, disclaim, demand, sue for, claim, and recover a legacy, bequest, devise, gift, or other property interest or payment due to or payable to or for the principal.

(2) Assert and interest in and exercise power over a trust, an estate, or property subject to fiduciary control.

(3) Establish a revocable trust solely for the benefit of the principal that terminates at the death of the principal.

(4) Exercise all powers with respect to estates and trusts the principal could exercise. However, the attorney in fact may not make or change a will.

Under the statute, an attorney in fact "shall use due care to act for the benefit of the principal." I.C. § 30–5–6–2.

■ Here, it is undisputed that Gene was the principal of the estate. Therefore, both Quigley and Gyla, as attorney in fact under the power of attorney, had a duty of care to act for Gene's benefit within the scope of the executed power of attorney. The statute is silent as to the creation of a

duty between the co-attorneys in fact. Rather, Indiana Code section 30-5-4-3(a) stipulates that "if more than one (1) attorney in fact is named, each attorney in fact may act independently of the other attorney in fact in the exercise of a power or duty." Accordingly, based on the clear statutory language, we find that a power of attorney only creates a duty of care between an attorney in fact and the principal of the trust or estate; no relationship, let alone a duty, is created between co-attorneys in fact.

Next, the Beckoms attempt to extend *Walker* and *Webb* by claiming that they can survive a motion for summary judgment by proving that Quigley "should have known" that the Beckoms were intended beneficiaries under Gene's will. (Appellant's Br. p. 15). In particular, the Beckoms allege that Quigley knew Gene was near the end of his life and thus should have acted immediately when Gyla notified Quigley that Gene wanted to change his estate plan instead of setting up a meeting seven days later. In essence, the Beckoms claim that if Quigley had performed his duty by acting in a reasonable manner, he would have learned that Gene intended to leave the farmstead to the Beckoms and, accordingly, the Beckoms would be the known third-party beneficiaries under the will.

However, the Beckoms' argument fails to distinguish between the duty of care, which includes a duty to establish Gene's testamentary intent, owed by Quigley to his client Gene, now his estate, and the duty owed by Quigley to the Beckoms because of their purported status as known third-party beneficiaries. Nevertheless, as our supreme court has held in *Walker*, only a *known* third-party beneficiary under a will can institute a negligence claim against the attorney-drafter of the will. *See Walker*, 526 N.E.2d at 969. Only in such circumstances will the attorney be able to identify the persons directly affected by his services so that he may undertake the proper duty of care towards them. Here, we concluded above that the Beckoms are not known third-party beneficiaries, and therefore, they cannot file a negligence claim against Quigley. *See id.*

Thus, based on the evidence before us, and in the absence of reasonable inferences that attorney Quigley actually knew that Gene wanted the Beckoms to inherit his farm, we cannot do anything else but affirm the trial court's grant of summary judgment. *See Colen,* 654 N.E.2d at 1163. To reverse the trial court and allow the Beckoms to survive summary judgment based on mere speculation that Gene intended to leave them the farmstead would drastically extend Indiana case law by allowing a third party to file a complaint based in negligence against the attorney-drafter of the will despite the lack of any clear evidence that the testator had communicated his intent to the attorney to confer a benefit on the third party. Such a result would unlock the floodgates of malpractice litigation for an unidentifiable and overly broad class of persons. Accordingly, in line with our supreme court's holding in *Walker,* we conclude that the existence of a relationship necessary to impose a duty on Quigley is lacking.

### 2. *Foreseeability*

Next, the Beckoms contend that there is a reasonable foreseeability of harm because Quigley knew that the services he was rendering for Gyla were performed for the benefit of the Beckom family. Specifically, the Beckoms claim that Gyla's notification of Quigley that Gene wanted to change certain testamentary provisions put Quigley on notice that the Beckoms would become beneficiaries under Gene's will. We disagree.

In analyzing the foreseeability component of duty, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. *Webb*, 575 N.E.2d at 997. In the instant case, the record shows that the only communication made to Quigley involved Gene's purported intent to grant Cannon a right of first refusal to buy his farm. As we stated before, the record is devoid of any evidence that Quigley was alerted of Gene's intent to benefit the Beckoms by leaving them the farm. Therefore, we conclude that the Beckoms were not reasonably foreseeable victims. *See id.*

### 3. *Public Policy*

 "Duty is not sancrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* Here, we find that public policy considerations weigh heavily against extending our supreme court's holding in *Walker* and applying it to intended third-party beneficiaries under a will. An attorney's first duty is toward his client. Were we to impose a duty on an attorney to consider the risk of harm to unknown third persons before drafting a will in accordance with his client's wishes, we would be forcing the attorney to weigh the welfare of unknown persons against the duty of care to his client. This course would result in attorneys being reluctant to draft a will for fear of being subject to a suit by an unknown third-party claiming an interest in the estate even though the client-testator never even alluded to the existence of these individuals as possible beneficiaries under his will. This we will not do.

### 4. *Balancing of the three factors*

In balancing the three elements constituting a duty, *i.e.*, a relationship between Quigley and the Beckoms, foreseeability, and public policy, we must conclude that Quigley did not owe a duty to the Beckoms. *See Webb*, 575 N.E.2d at 995.

### B. *Standard of Care and Proximate Cause*

Besides the existence of a duty of care, in order to recover on a theory of negligence, the Beckoms also have to establish that Quigley failed to conform his conduct to the requisite standard of care and that the Beckoms' injury was proximately caused by the breach. *See id.* However, since we already established the absence of a duty of care owed by Quigley to the Beckoms, we do not need to address the other two elements of a negligence action. Consequently, we affirm the trial court's grant of summary judgment in favor of Quigley.

### III. *Fraudulent or Tortious Interference with Inheritance*

 Lastly, the Beckoms contend that because Quigley served as Gene's attorney and co-executor of his will, the inference can be made that Quigley purposely "set the estate up this way in order to tally up numerous billable hours by spreading the will through probate and assisting Purdue and Taylor High School in establishing their trusts." (Appellant's Br. p. 27). To that end, the Beckoms maintain, Quigley fraudulently sabotaged Gene's intent in naming the Beckoms as his beneficiaries in order to further his own financial gain.

 Pursuant to Indiana Trial Rule 9(B), fraud must be pled with specificity, including the time, place, substance of the false representations, and an identification of what was procured by fraud. *See Weber v. Costin*, 654 N.E.2d 1130, 1134 (Ind.Ct. App.1995). A complaint which does not satisfy these requirements fails to state a redressable claim. *Id.* Our review of the record reflects that the Beckoms' Com-

plaint only sounds in negligence and lacks any references to a fraud claim. Furthermore, we note that the first time the Beckoms asserted a basis for a fraud claim was during the hearing on Quigley's Motion for Summary Judgment; and even then, the claim was made in very general terms only, lacking all required specificity. In particular, Beckoms' attorney stated:

> But again, if you enter judgment in their favor, you're saying to the lawyers, well just look out for your own well being and this is a situation which the jury could look at the evidence and they could say, hey well, the reason he didn't get the [w]ill changed is because [Quigley] was just looking out for his own well being, because the [w]ill says that [Quigley] is supposed to be [c]o-[e]xecutor of the estate and in addition to that, your Honor, the [w]ill says that [Quigley] is supposed to be the attorney that gets the [w]ill probated. Now I just went to an ICLEF seminar about a month ago and all the presenters were in unison and they said, well we really don't, there's no published decision on this, but we really think it's very bad [ . . . ] practice to put your own name in a[w]ill. It could be viewed as solicitation. So [Quigley] has a financial interest in this, in the outcome of this thing just the way it is. I don't know what inferences the jury will draw from that but those facts are certainly there.

(Appellant's App. pp. 27–8). Accordingly, since the Beckoms did not plead fraud with specificity in their Complaint, they fail to state a redressable claim. *Id.*

### CONCLUSION

Based on the foregoing, we find that as a matter of law, attorney Quigley did not owe a duty to the Beckoms because they were unknown third-party beneficiaries under a will. We further find that the Beckoms fail to state a redressable claim

with respect to their allegation that Quigley fraudulently interfered with the inheritance in order to reap a personal financial benefit. Therefore, we hold that the trial court properly granted summary judgment as a matter of law in favor of Quigley.

Affirmed.

CRONE, J., and ROBB, J., concur.