**OPINION**



**FILED**

Oct 19 2016, 6:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

James A. Knauer
Steven E. Runyan
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Forrest Bowman, Jr.
Jennifer K. Bowman
Bowman & Bowman

Mark Crandley
Barnes & Thornburg, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Central Indiana Podiatry, P.C.,
Northwest Surgery Center, LLC,
d/b/a Foot & Ankle Surgery
Center,
f/k/a Foot & Ankle Surgery
Center, LLC and Anthony E.
Miller, D.P.M.,

*Appellants-Plaintiffs,*

v.

Barnes & Thornburg, LLP,

*Appellee-Defendant.*

October 19, 2016

Court of Appeals Case No.
49A02-1603-PL-498

Appeal from the Marion Superior
Court

The Honorable Cynthia J. Ayers,
Judge

Trial Court Cause No.
49D04-1210-PL-41939

**May, Judge.**

Central Indiana Podiatry, P.C. ("CIP"), Northwest Surgery Center, LLC d/b/a Foot & Ankle Surgery Center f/k/a Foot & Ankle Surgery Center, LLC ("FASC"),[1] and Anthony Miller, D.P.M. ("Miller") (collectively "the Miller Parties") appeal summary judgment for Barnes & Thornburg, LLP ("B&T"). The Miller Parties present multiple issues for our review, which we consolidate and restate as:

> 1. Whether the Miller Parties' allegations of fraud preclude B&T from relying on the Release Agreement; and

> 2. Whether the terms of the Release Agreement preclude the Miller Parties from suing B&T for the alleged acts of malpractice.

We affirm.

# Facts and Procedural History

B&T had provided legal services to Miller, as owner and sole shareholder of CIP and FASC, since the early 1990's. The current case stems from a disagreement regarding legal fees.

### 1. The Vogel Federal Litigation

On November 7, 2005, Thomas Vogel, D.P.M., a former employee of CIP and FASC, filed a federal claim ("Vogel Federal Litigation") against the Miller

---

[1] We will refer to the Northwest Surgery Center as FASC throughout this opinion because FASC is the acronym used by the courts and parties.

Parties alleging, among other things, "anti-kickback violations, mail, wire, and healthcare fraud, money laundering, racketeering activity, breach of contract, back wages, conversion, and offenses against property." (Br. of Appellee at 6.)

[4] On December 28, 2005, B&T, on behalf of the Miller Parties, filed an answer to the complaint, a counterclaim, and a request for an injunction. B&T partner William Pope was the billing attorney for the work involved in the action, but three other B&T partners, J. Michael Grubbs, Thomas Shea, and John Koenig, also entered appearances.

[5] Vogel filed three motions for summary judgment in the Vogel Federal Litigation between February 8 and March 8, 2006, causing B&T to spend extra time on the case. On May 17, the court consolidated the Vogel Federal Litigation with a claim brought by another former Miller employee, Yong Chae, D.P.M., which included similar allegations. B&T also represented the Miller Parties in the Chae claim. The court set a hearing for May 25, 2006, to consider arguments regarding the Miller Parties' motions for injunction in both cases.

[6] During the pendency of the Vogel Federal Litigation and the Chae claim, Miller complained several times to Pope about the legal fees B&T was charging him. In response, Pope proposed an agreement that indicated Miller had been billed, as of March 31, 2006, attorney fees of $138,008.50 in the Vogel Federal Litigation and $4,082.00 in the Chae claim, for a total of $142,090.50. As of the date of the proposed agreement, Miller had paid $23,886.12. The proposed

agreement contained provisions regarding payment and a cap on Miller's legal fees. Pope advised Miller to retain independent counsel to review the agreement. On May 16, 2006, Miller rejected Pope's proposed agreement.

[7] At the hearing on May 25, the judge in the Vogel Federal Litigation advised Miller and Vogel to try to reach a settlement. During the negotiations, Miller expressed an interest in maintaining a professional relationship with Vogel because Vogel would produce additional revenue for FASC by performing surgeries at FASC. Koenig advised Miller against continuing the relationship because Vogel had previously sued Miller, accused Miller of dishonesty, and allegedly operated on patients while he was impaired. After many hours of negotiation, Miller reached settlement agreements with both Vogel and Chae.

[8] The Vogel settlement required multiple agreements among the parties to be entered into within thirty days of the agreement:

> 1. The parties agree to simultaneously enter into the following agreements within 30 days after the date of this Agreement:
>
>> a) A Mutual Release from the Restrictive Covenant in the Employment Agreement between CIP and Dr. Vogel.
>>
>> b) An Option Agreement between FASC and Dr. Vogel permitting Dr. Vogel to purchase up to 2% of the ownership of FASC.
>>
>> c) A Subscription Agreement for the purchase of at least one share of FASC containing a provision requiring the shareholder to exclusively perform all surgeries at FASC

> unless the patient's condition or patient's choice requires
> that the surgery be performed elsewhere.
>
> d) A Mutual Waiver and Release of all claims raised in or
> that could have been raised in the lawsuit.
>
> e) A Dismissal of the lawsuit with prejudice via a
> stipulation that includes all allegations of fraud.
>
> f) A Mutual Non-disparagement Agreement.

(App. at 350.)

[9] Because of the agreement to transfer a portion of FASC ownership to Vogel, Pope advised Miller he would need to change FASC's status as an "S" subsidiary of CIP for federal income tax purposes. To do so, Pope proposed the creation of a new limited liability company ("LLC") in which FASC and Vogel would have ownership interests, thus preserving the "S" subchapter election. Pope spoke with Miller on May 30 and June 1, 2006, regarding this plan. Pope prepared documentation to create the new LLC around that time as well. Pope sent the documentation regarding the proposed LLC creation to Vogel's attorney, Paul Black, on June 19, 2006.

[10] Also in early June 2006, Miller and Pope had multiple telephone conversations regarding legal fees Miller owed B&T. Around this time, Miller and Pope reached an oral agreement about the fees. On June 19, 2006, Pope sent Miller the written expression of that oral agreement, entitled the Settlement and Release Agreement ("Release Agreement"). Pope told Miller that B&T would

require Miller to consult independent counsel before executing the Release Agreement. The Release Agreement also provided Miller was required to consult independent counsel before executing the Release Agreement.

[11] Miller consulted Jim Knauer, who had represented the Miller Parties in other matters in the past. Pope spoke with Knauer via telephone on June 20, 2006, and Knauer indicated he had reviewed the Release Agreement. On June 22, 2006, at 5:00 p.m., Pope met with Miller to discuss the LLC Documentation and the Release Agreement. Miller confirmed he had discussed the Release Agreement with Knauer and "said Knauer told him the terms proposed were standard and he would have to accept them to get the fee reductions." (*Id.* at 123.) By the time Miller reviewed the Release Agreement, he had incurred legal fees in the Vogel Federal Litigation and the Chae case in excess of $190,000.00. Miller signed the Release Agreement. The meeting lasted approximately ninety minutes.

[12] The terms of the Release Agreement provided, in relevant part:

> 1. The Miller Parties shall pay to B&T the total sum of One Hundred Forty-Five Thousand Dollars and No Cents ($145,000.00) by check, made payable to Barnes & Thornburg, LLP, which check shall be delivered to B&T on or before June 30, 2006.

> 2. Upon payment of the amount set forth in paragraph 1 hereof, the Miller Parties are released and forever discharged by B&T from the payment of any further amounts to B&T for costs or

services performed on the Lawsuits.[2] The Miller Parties are expressly not released or discharged from the payment for any costs or fees associated with any services performed by B&T for one or more of the Miller Parties on any matters other than the Lawsuits.

3. The Miller Parties agree that B&T has earned and is entitled to keep the amount set forth in paragraph 1 hereof, plus all other sums previously paid to B&T by any one or more of the Miller Parties.

4. The Miller Parties hereby release and forever discharge B&T, and all predecessor and successor firms, including without limitation their respective present and past partners, associates and employees, from any and all claims, of any nature, known or unknown, which the Miller Parties now have, have had, or may later claim to have arising from or related to any aspect of B&T's representation of the Miller Parties relating in any way to the Lawsuits.

5. Upon conclusion of the Lawsuits, B&T will provide to the Miller Parties, at the Miller Parties' own expense, a copy of its legal file as kept in the ordinary course of business related to B&T's representation of the Miller Parties in the Lawsuits. The Miller Parties release B&T from any obligation it may have to keep or maintain any files or documents related to B&T's representation of the Miller Parties in the Lawsuits after the conclusion of the Lawsuits.

---

[2] The Release Agreement indicates the "Lawsuits" are the "claims asserted against the Miller Parties in the matter of <u>Thomas A. Vogel, D.P.M. v. Anthony E. Miller, D.P.M., et al.</u>, Cause No.1:05-CV-1668-SEB-VSS, and the matter of <u>Yong Chac [sic], D.P.M. v. Anthony E. Miller, D.P.M., et al., Cause No. 1:06-CV-09195-LJM-VSS</u>, presently pending in the United States District Court for the Southern District of Indiana, Indianapolis Division[.]" (App. at 177.)

6. The Miller Parties declare, warrant and represent that:

(a) The Miller Parties have not assigned nor transferred to any person, entity or party any claims that are the subject of this Agreement and that they are the sole party in interest with respect to the claims about which this Agreement is being made;

(b) No promise, enticement or agreement not expressed in this Agreement has been made to the Miller Parties and that the terms of the Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof, and that the terms of this Agreement are contractual and not merely a recital; and

(c) The Miller Parties may in the future discover facts different from or in addition to those which they now know or believe to be true with respect to the matters that are the subject of this Agreement, and the Miller Parties agree that this Agreement shall remain in effect in all respects, notwithstanding the discovery or existence of different or additional facts.

7. B&T declares, warrants and represents that:

(a) B&T has not assigned nor transferred to any person, entity or party any claims that are the subject of this Agreement and that it is the sole party in interest with respect to the claims about which this Agreement is being made;

(b) No promise, enticement or agreement not expressed in this Agreement has been made to B&T and that the terms of the Agreement constitute the entire agreement between

the Parties with respect to the subject matter hereof, and that the terms of this Agreement are contractual and not merely a recital; and

(c)  B&T may in the future discover facts different from or in addition to those which it now knows or believes to be true with respect to the matters that are the subject of this Agreement, and B&T agrees that this Agreement shall remain in effect in all respects, notwithstanding the discovery or existence of different or additional facts.

8.  Pursuant to Rule 1.8(h) of the Indiana Rules of Professional Conduct, B&T expressly informs the Miller Parties that independent representation is recommended and appropriate in connection with a client settling a claim against their lawyer. Accordingly, the Miller Parties should obtain independent representation of an attorney not affiliated with B&T in connection with entering into this Agreement.  The Miller Parties are cautioned that B&T is representing only its own interests in negotiating and preparing this Agreement and is not representing or protecting the interests of the Miller Parties with regard to this Agreement.

9.  Each party represents and acknowledges that they have relied upon the advice of independent counsel in reaching agreement on the terms contained herein, and each party acknowledges that, for purposes of entering into this Agreement, they have not and do not rely upon any representation or statement made by the other party or that party's agent or representative that is not expressly stated in this Agreement.

* * * * *

15. Each individual signing this Agreement hereby acknowledges that he or she has carefully read this entire Agreement and understands its contents.

(*Id*. at 178-181) (footnote added).

[13] On June 23, 2006, Pope read an email from Vogel's attorney, Paul Black, regarding the LLC Documentation. The email was time stamped at 6:11 p.m. on June 22, 2006. It was the first correspondence Pope received from Black regarding the matter. Black indicated Vogel objected to the clauses in the LLC Documentation that would impose on Vogel a lifelong obligation to perform surgeries at FASC. Black and Miller's attorneys corresponded via email many times following the initial response and the parties disagreed about the interpretation of some of the terms of the Vogel Agreement. Pope had multiple conversations with Miller regarding this issue in June and July 2006.

[14] On July 24, 2006, B&T received $145,000.00 from Miller as agreed in the Release Agreement. In the coming months, Miller's attorneys at B&T and Black attempted to come to an agreement regarding the LLC Documentation. Pope updated Miller on the status of these negotiations on a regular basis. On September 26, 2006, Vogel signed a "Subscription for Common Shares," (*id*. at 45) (Subscription Agreement), for the purchase of one share of stock in FASC. However, he later refused a certificate of interest in the LLC and demanded the return of the check he tendered for the purchase of the stock. The check was never returned and never deposited. On September 29, 2006, Pope filed paperwork with the Indiana Secretary of State converting FASC to an LLC.

On October 3, 2006, the parties filed a stipulation of dismissal in the Vogel Federal Litigation, which the court granted on October 6. On October 11, B&T attorney Grubbs received a letter from Black stating:

> Vogel did not agree to buy interest in Foot & Ankle Surgery Center, LLC, nor did he consent to the conversion of Foot and Ankle Surgery Center, Inc., to Foot & Ankle Surgery Center, LLC. Please inform your clients that, among other things, they are in material breach of the [Subscription Agreement] signed by Dr. Vogel on September 26, 2006.

(*Id*. at 368-9.) On March 12, 2007, Knauer, as Miller's new counsel, filed a motion to vacate the dismissal of the Vogel Federal Litigation. The court denied the motion on May 3, 2007.

## 2. The Hamilton County Litigation

On May 31, 2007, Miller and CIP, represented by Knauer, filed a claim ("Hamilton County Litigation") in Hamilton Superior Court against Vogel, alleging breach of the Subscription Agreement.[3] Vogel responded with a counterclaim against the Miller Parties, asserting they breached the Subscription Agreement first. On September 6, 2012, a jury found for Vogel on both the claim and counterclaim, but it awarded him no damages.

---

[3] FASC was not originally a party in the Hamilton County Litigation, but was added later.

### 3. The Malpractice Action

On October 26, 2012, the Miller Parties filed a claim against B&T for malpractice ("Malpractice Action"), which is the action underlying this appeal. On October 7, 2013, the Miller Parties filed an amended complaint alleging "Attorney Malpractice." (*Id.* at 41.) On April 21, 2014, B&T filed its answer to the amended complaint and asserted as an affirmative defense, "All of Plaintiffs' claims set forth in the First Amended Complaint are barred by the [Release Agreement]." (*Id.* at 65.) On November 13, 2013, B&T filed a motion to dismiss the claim based on the terms of the Release Agreement. In response, the Miller Parties alleged B&T engaged in fraud in the inducement, fraudulent concealment, and constructive fraud when entering the Release Agreement with Miller and thus the Release Agreement was subject to reformation and/or rescission.[4] On March 18, 2014, the trial court denied B&T's motion to dismiss.

B&T filed two motions for summary judgment - the first on March 24, 2015, and the second on August 19, 2015. The trial court held a hearing on both

---

[4] The Miller Parties' reply to B&T's motion to dismiss, wherein they asserted their claims of fraud, is not in the record before us. However, B&T indicates in its first motion for summary judgment, "In response to [B&T's motion to dismiss] the plaintiffs claimed for the first time that B&T fraudulently induced them to enter into the Release, and it is therefore unenforceable against them." (App. at 69.) B&T's first motion for summary judgment also mentioned the Miller Parties' other allegations of fraud made in their reply to B&T's motion to dismiss. In their response to B&T's motion for summary judgment, the Miller Parties do not dispute B&T's statement regarding when the Miller Parties first made the fraud claims.

motions for summary judgment on December 7, 2015. On February 16, 2016, it granted summary judgment for B&T.

# Discussion and Decision

[19] We review summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Drawing all reasonable inferences in favor of the non-moving party, we will find summary judgment appropriate if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id*. We will affirm a summary judgment on any theory or basis found in the record. *Allen Gray Ltd. P'ship IV v. Mumford*, 44 N.E.3d 1255, 1256 (Ind. Ct. App. 2015).

## 1. Allegations of Fraud

[20] B&T filed a motion to dismiss that asserted the Release Agreement precluded the Miller Parties' action. In response, the Miller Parties claimed B&T's actions in procuring the Release Agreement constituted fraudulent inducement and fraudulent concealment, and B&T engaged in constructive fraud. B&T then filed a motion for summary judgment that asserted, as a matter of law, the Miller Parties could not raise fraud in response to B&T's motion to dismiss.

The averment of allegations of fraud is governed by Indiana Trial Rule 9, generally titled, "Pleading special matters." T.R. 9(B) states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be specifically averred. Malice, intent, knowledge, and other conditions of mind may be averred generally." Thus, unlike most claims, which require only a "short and plain statement of the claim [and] a demand for relief," T.R. 8(A), fraud must be raised in the pleadings. *See Weber v. Costin*, 654 N.E.2d 1130, 1134 (Ind. Ct. App. 1995) (T.R. 9(B) requires fraud be alleged as part of a pleading).

Pleadings in an action before the trial court include:

> (1) a complaint and an answer;
>
> (2) a reply to a denominated counterclaim;
>
> (3) an answer to a cross-claim;
>
> (4) a third-party complaint, if a person not an original party is summoned under the provisions of Rule 14; and
>
> (5) a third-party answer.

T.R. 7(A). That rule also states: "No other pleadings shall be allowed; but the court may in its discretion, order a reply to an answer or third-party answer." *Id*. The Miller Parties asserted fraud in response to a motion to dismiss. However, neither a motion nor a response to a motion is considered a pleading.

*Rivera ex rel. Rivera v. City of Nappanee*, 704 N.E.2d 131, 132 (Ind. Ct. App. 1998), *trans. denied*.

[23]   In *Beckom v. Quigley*, 824 N.E.2d 420 (Ind. Ct. App. 2005), the Beckoms were unknown third-party beneficiaries to a will. Quigley was the testator's attorney and co-executor of the will. In their complaint, the Beckoms alleged Quigley was negligent in his preparation of the testator's will because he did not ascertain the Beckoms were intended beneficiaries. During the hearing on Quigley's motion for summary judgment, the Beckoms alleged Quigley "fraudulently sabotaged [the testator's] intent in naming the Beckoms as his beneficiaries in order to further his own financial gain." *Id*. at 428. We rejected the Beckoms' allegation of fraud because their complaint asserted negligence, not fraud. The Beckoms stated their allegation of fraud during the hearing regarding Quigley's motion for summary judgment. Thus, they did not state a claim of fraud as required by T.R. 9(B). *Id*. at 429.

[24]   Here, the Miller Parties contend the trial court should have determined the Release Agreement was subject to reformation and/or rescission based on the Miller Parties' allegations of fraud. However, the Miller Parties did not include the allegations of fraud in the complaint. Instead, they averred fraud "for the first time" as part of a reply to B&T's motion to dismiss. (App. at 69.) As the Miller Parties did not plead fraud as part of their complaint, they have not stated a redressable claim. *See Beckom*, 824 N.E.2d at 429 ("since the Beckoms did not plead fraud with specificity in their Complaint, they fail to state a redressable claim"). As the Miller Parties' fraud allegations were improperly

presented to the trial court, and thus unavailable, we must consider whether the terms of the Release Agreement precluded the Miller Parties' allegations of malpractice.

### 2. *Waiver of Liability in Release Agreement*

The construction of a contract is a question of law. *Rice v. Meridian Ins. Co.*, 751 N.E.2d 685, 688 (Ind. Ct. App. 2001), *trans. denied*. When we interpret contract provisions, our goal is to enforce the intent of the parties as provided in the contract. *Id*. If the language is clear and unambiguous, we give that language its plain and ordinary meaning and enforce the contract according to its terms. *Id*. A contract is to be read as a whole when trying to ascertain the parties' intent, and we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id*. We must accept an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict. *Id*.

The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone. *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1062 (Ind. Ct. App. 2009), *reh'g denied*. In determining the intention of the parties, a contract should be considered in light of the surrounding circumstances when it was made. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). Specifically, we should consider the nature of the agreement, the facts and circumstances leading up to the execution of the contract, the relationship

of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Id.*

[27] The Miller Parties and B&T entered into the Release Agreement on June 22, 2006. The release provision says:

> The Miller Parties hereby release and forever discharge B&T, and all predecessor and successor firms, including without limitation their respective present and past partners, associates and employees, from any and all claims, of any nature, known or unknown, which the Miller Parties now have, have had, or may later claim to have arising from or related to any aspect of B&T's representation of the Miller Parties relating in any way to the [Vogel Federal Litigation and Chae Case].

(App. at 179.) The Miller Parties agreed:

> The Miller Parties may in the future discover facts different from or in addition to those which they now know or believe to be true with respect to the matters that are the subject of this Agreement, and the Miller Parties agree that this Agreement shall remain in effect in all respects, notwithstanding the discovery or existence of different or additional facts.

(*Id.*) The Miller Parties contend the Release Agreement "is not prospective in nature," (Br. of Appellants at 38), and thus B&T could be found liable for negligence occurring after the Release Agreement was signed.

[28] In support of their argument, the Miller Parties make much of the words "known and unknown" in the Release Provision, asserting those words indicate the claims covered by the Release Provision "must refer to accrued claims as it

is not possible to 'know something' (or not know something) that has not yet happened." (Br. of Appellants at 40.) That argument is inconsistent with other contract language. The Miller Parties released B&T from claims "arising from or related to any aspect of B&T's representation of the Miller Parties relating in any way" to the Vogel Federal Litigation and the Chae case. (App. at 179.) The Release Agreement is to be in effect "notwithstanding the discovery or existence of different or additional facts." (*Id*.)

[29] The Miller Parties' claims of negligence arose from B&T's alleged failure to draft an agreement Vogel would sign as part of the Vogel Federal Litigation. When considering the Release Agreement as a whole, we conclude the Release Agreement encompasses any action related to the Vogel Federal Litigation, whether or not the behavior giving rise to that action accrued prior to the execution of the Release Agreement. *See Rice*, 751 N.E.2d at 688 (if contract terms are unambiguous, appellate court interprets the terms using plain and ordinary language; the language is not examined in a vacuum, instead we consider the language of the contract as a whole and construe it to harmonize the terms).

# Conclusion

[30] The Miller Parties did not properly present their fraud claims to the trial court because they did not do so in a pleading. The trial court did not err when it granted summary judgment in favor of B&T because the Release Agreement

prohibits the Miller Parties from suing B&T for actions taken in the Vogel Federal Litigation. Accordingly, we affirm.

[31] Affirmed.

Bailey, J., concurs.

Crone, J., concurs with separate opinion.

Central Indiana Podiatry, P.C.,
Northwest Surgery Center, LLC,
d/b/a Foot & Ankle Surgery
Center,
f/k/a Foot & Ankle Surgery
Center, LLC and Anthony E.
Miller, D.P.M.,

*Appellants-Plaintiffs,*

v.

Barnes & Thornburg, LLP,

*Appellee-Defendant.*

Court of Appeals Case No.
49A02-1603-PL-498

**Crone, Judge, concurring.**

[32] I agree with my colleague's resolution of the issues presented in this appeal. I write separately, however, to question the wisdom of allowing attorneys to prospectively insulate themselves from liability for future acts of legal malpractice.

[33] The Code of Professional Responsibility, which governed Indiana's legal community until 1987, "categorically prohibited all attempts to limit [an] attorney's liability for malpractice." *Matter of Blackwelder*, 615 N.E.2d 106, 108 (Ind. 1993) (citing Disciplinary Rule 6-102). At least one attorney was disbarred based partly on such "abhorrent" conduct. *Matter of Powell*, 526

N.E.2d 971, 974 (Ind. 1988) (finding pre-1987 violations of Disciplinary Rule 6-102 and other Code provisions: attorney forged checks, converted clients' funds, and "exacerbated the misconduct by attempting to exonerate himself" with release agreement). A sea change occurred when the Indiana Supreme Court adopted the Rules of Professional Conduct, which are based on the American Bar Association's Model Rules. Rule 1.8(h)[5] currently provides that a lawyer shall not

> (1) make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement; or

> (2) settle a claim or potential claim for such liability with an unrepresented client or former client unless that person is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel in connection therewith.

As far as I am aware, no explanation was offered for this change in policy.

[34] The Rules' preamble states that "[a] lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." It further states that "[i]n all professional functions a lawyer should be competent, prompt

---

[5] Rule 1.8(h) mirrors the corresponding ABA Model Rule.

and diligent." *Id.*[6] These lofty concepts are rendered meaningless when lawyers are allowed to avoid liability for future incompetence or lack of diligence and thereby degrade the quality of justice. According to the preamble, "[t]he [legal] profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar." The practice of law is and should be a profession and not merely a simple business transaction. To hold otherwise is to ignore the fundamental fiduciary relationship an attorney owes a client. For this reason (and others), I do not believe that it is wise public policy to allow lawyers to draft their own "get out of jail free" cards.

[35] In this case, the clients that agreed to release counsel from liability for any future malpractice were sophisticated and had sufficient resources to hire a reputable law firm to review the liability release. Many clients are not so fortunate. I also find it troubling that the Rules apparently would not prohibit lawyers from inserting liability releases into initial fee agreements as a matter of course, which would fundamentally change the nature of the attorney-client relationship from one of loyalty and fiduciary duty to one of purely economic self-interest.

---

[6] *See* Ind. Professional Conduct Rules 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.") and 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client.").

[36] I presume that our supreme court took these and similar considerations into account when it adopted Rule 1.8(h). And I understand that B&T is operating within the parameters established by our current Rules of Professional Conduct. Therefore, I am compelled to concur as to this issue. Furthermore, this case has been decided on summary judgment. There has been no determination regarding the quality of legal services provided by B&T, and my objection to the current state of the law should not be interpreted as professing an opinion on such matters.

[37] Legitimate arguments can be made that lawyers should be allowed to limit liability to clients for past acts of malpractice in arm's-length negotiations involving independent counsel; this is nothing more than the settlement of an existing claim. But, in my view, allowing lawyers to prospectively limit liability to clients for future acts of malpractice subverts the very nature of the attorney-client relationship. Until and unless our supreme court abolishes this practice, Hoosiers seeking competent and diligent legal representation may be left to fend for themselves against lawyers who wish to avoid liability for future acts of malpractice.